UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

**325 BLEECKER, INC.,**

               **Plaintiff,**

          v.

**LOCAL UNION No. 747, UNITED BROTHERHOOD
OF CARPENTERS AND JOINERS OF AMERICA (as
successor to LOCAL UNION No. 120, UNITED
BROTHERHOOD OF CARPENTERS AND JOINERS
OF AMERICA),**

               **Defendants.**
_____

02-CV-844
(NAM/DEP)

**APPEARANCES:**                             **OF COUNSEL:**

EDWARD F. CRUMB, ESQ.
P.O. Box 1393
Binghamton, New York 13902-1393
*Attorney for Plaintiff*

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.        JOHN H. BYINGTON, III, ESQ.
1505 Kellum Place
Mineola, New York 11501
*Attorneys for Defendant*

**Norman A. Mordue, Chief U.S. District Judge**

## MEMORANDUM - DECISION AND ORDER

      Currently before the Court is defendant's motion for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure.  Defendant, Local Union No. 747, United Brotherhood of

Carpenters and Joiners of America (as successor to Local Union No. 120, United Brotherhood of

Carpenters and Joiners of America) ("Local 747") seeks an order under Section 301 of the Labor

Management Relations Act, 29 U.S.C. § 185 (the "LMRA"), the Declaratory Judgment Act, 28

U.S.C. §§ 2201 and 2202, and in accordance with Section 202(b) of the Labor Management

Reporting and Disclosure Act, 29 U.S.C. § 431(b) (the "LMRDA"), which:

declar[es] that 325 Bleecker, Inc., formerly known as Carpenters Local No. 120 Building Corporation (the "Building Corp[oration]"), and all of its assets, including the property and premises located at 325 Bleecker Street, Utica, New York (the "Real Property"), have at all relevant times been assets of the former Carpenters Local Union No. 120 ("Local 120"), and subject to and governed by the Constitution and Laws of the United Brotherhood of Carpenters and Joiners of America (the "UBC" and "UBC Constitution"), including as of the date of the dissolution and transfer of assets of Local 120 by UBC General President Douglas J. McCarron, effective September 1, 2001; (b) declar[es] that all of the assets and property of the dissolved Local 120, including the Building Corp[oration] and the Real Property, are, as of September 1, 2001, the property and assets of Local 747 . . . pursuant to the August 10, 2001, order and direction of dissolution and transfer of assets by UBC General President Douglas J. McCarron; (c) declar[es] that Local 747 be awarded possession, use and enjoyment of the Real Property; (d) declar[es] that the June 13, 2002 removal and interim appointment of officers of the Building Corp[oration] by Local 747's President pursuant to the UBC Constitution was valid and of full force and effect; and (e) permanently enjoin[s] and restrain[s] the former officers of the Building Corporation, including Edward Morgan, William Gibson, Patricia LaBella and Mike Juliano, their attorneys, representatives, agents and employees, from: (i) refusing to turn over any and all property, books, records, funds and assets of the Building Corp[oration], and that they do immediately turn over all such things; (ii) holding themselves out to others as officers or representatives of the Building Corp[oration]; (iii) acting on behalf of the Building Corp[oration]; (iv) interfering with or attempting to interfere with Local 747's rights under the UBC Constitution with respect to the possession and control of the Building Corporation and its assets and the Real Property; (v) asserting possession or control over the property and assets of the Building Corp[oration], including the Real Property and any funds on deposit with any bank in the name of the Building Corp[oration]; (vi) dissipating, transferring, encumbering or expending any type of assets of the Building Corp[oration], including the Real Property and any funds on deposit with any bank in the name of the Building Corp[oration]; (f) awards judgment in favor of Defendant and against the plaintiff, dismissing the petition herein in its entirety; and (g) awards such other and further relief as the Court deems just and proper.

Dkt. No. 27, Notice of Mot. plaintiff, 325 Bleecker, Inc., opposes this motion. *See* Dkt. No. 29. For the reasons that follow below, defendant's motion summary judgment is GRANTED.

## I.   BACKGROUND

### A.    *Procedural History/Previous Proceedings*[1]

Plaintiff commenced this action in Utica City Court as an eviction action against Local 747

---

[1] Originally, Senior Judge Howard G. Munson was assigned to this case, and he oversaw the previous proceedings. The case has since been transferred to this Court. *See* Dkt. No. 34.

2

for its alleged failure to fulfill obligations under a written lease agreement made between Local 747's predecessor in interest, "Local 120," and 325 Bleecker, Inc., in its name as formerly known, the Local 120 Building Corporation. *See* Dkt. No. 13, Mem. of Law at 1. Local 747 subsequently removed the action to federal court pursuant to 11 U.S.C. §§ 1141 and 1146 and brought a counterclaim for declaratory and injunctive relief. *See* Dkt. No. 1, Notice of Removal; Dkt. No. 6, Mot. for Prelim. Inj.

The Court conducted a conference in which the parties discussed defendant's application for a temporary restraining order and request for a preliminary injunction hearing. *See* Dkt. No. 10, Minute Entry. The parties agreed to continue their settlement discussions; however, because they were unable to reach a settlement, the Court issued a temporary restraining order and directed the parties to appear for a preliminary injunction hearing. *See* Dkt. No. 12, Order to Show Cause. The Court held a hearing and issued a decision granting Local 747's motion for a preliminary injunction. *See* Dkt. No. 20, Order.

B.    *Underlying Dispute*

The parties' dispute arose out of a UBC consolidation action. The UBC dissolved Local 120 and consolidated it with Local 747 effective September 1, 2001; in essence, Local 747 subsumed Local 120 and Local 120 ceased to exist. In conjunction with the dissolution and merger of Local 120, the UBC ordered Local 120 to transfer all of its assets–property, accounts, books, records, and other assets–to Local 747. The parties disagreed as to whether the Building Corporation, as well as its "offspring," 325 Bleecker, Inc., was an asset of Local 120. *See* Dkt. No 7, Mem. of Law at 2.

Local 747 is a chartered local union of the UBC as was Local 120 until its dissolution. As such, both locals were–and Local 747 remains–subject to the UBC's Constitution and its leadership's directives. On August 10, 2001, UBC General President Douglas J. McCarron, in accordance with Section 6A of the UBC Constitution, dissolved Local 120 and merged its membership and

3

jurisdiction into Local 747, effective September 1, 2001. Additionally, McCarron, in accordance with Section 30A of the UBC Constitution, ordered Local 120 to transfer all of its assets to Local 747. *See* Dkt. No. 27, Statement of Material Facts at ¶¶1-6; Dkt. No. 20, Order at 3-4.

Since the dissolution of Local 120 and its merger into Local 747, plaintiff, by its representatives and claimed officers, including Edward Morgan, have not transferred the property, books, records, and assets in the custody or control of 325 Bleecker, Inc. Similarly, plaintiff has not transferred the real property and premises located at 325 Bleecker Street, Utica, New York (the "Real Property") held in the name of the Building Corporation as formerly known, Carpenters Local No. 120 Building Corporation. *See* Dkt. No. 27, Statement of Material Facts at ¶¶ 7-8.

In 1994, Local 120 purchased the Real Property located at 325 Bleecker Street for use as its union hall. Local 120's executive board recommended the purchase for approval to its general membership who consented to the purchase on October 12, 1994. Local 120 assigned title to the Real Property to the Local 120 Building Corporation and approved a $70,000 transfer to the "building corporation fund." Local 120 further determined that its officers, president, vice president, secretary and treasurer, would similarly serve as the Building Corporation's officers. On October 20, 1994, the Local 120 Building Corporation received the deed, which transferred title of the Real Property to "Carpenters Local No. 120 Building Corporation." On October, 21, 1994, Local 120 also filed the Certificate of Incorporation for the Building Corporation with the New York Secretary of State. *See* Dkt. No. 20, Order at 4, 14; Dkt. No. 27, Statement of Material Facts at ¶¶ 9-14.

Under the Building Corporation's bylaws, as initially adopted, the officers of Local 120 were, by virtue of their position as officers of Local 120, designated as the officers and directors of the Building Corporation. The Building Corporations's bylaws provided that "active members in good standing of [the Local 120] shall be members of the corporation . . . upon any member of the [Local 120] failing to maintain himself as a member of said Local 120 in good standing, he shall,

4

concurrently with his loss of membership of said Local 120, no longer be a member of the corporation." *Id.* at ¶¶16-17.

By 1995, the Building Corporation applied for and received tax-exempt status as an Internal Revenue Code Section 501(c)(2) real estate title holding corporation. As stated in its Certificate of Incorporation, the Building Corporation's purpose, was to hold "title to property, collecting income therefrom and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under Internal Revenue Code Section 501(a). No part of the assets, income, or profit of the Corporation shall be distributable to, or inure to the benefit of, its members, directors or officers except to the extent permitted under the Not-for-Profit Corporation Law." *See* Dkt. No. 8, Byington Decl. at Ex. 3, Certificate of Incorporation.

Over the next five years, Local 120 approved and paid for renovations of the Real Property, which totaled some $45,000. *See* Dkt. No 20, Order at 4-5. On March 8, 1995, a general membership meeting of the Local 120 convened, and the membership authorized a $25,000 transfer from Local 120 to the Building Corporation. In May1995, Local 120 allocated its negotiated wage increase to the Local 120 Building Corporation, which took effect in July 1995 and included an allocation of three cents per hour. On June 14, 1995, a general membership meeting of the Local 120 convened, and the membership authorized a $20,000 transfer from Local 120 to the Building Corporation. In addition, Local 120's executive board also approved certain purchases for the Building Corporation (tools and a computer) and decided to obtain a new insurance carrier for the Building Corporation. *See* Dkt. No. 27, Statement of Material Facts at ¶¶18-22, 24; Dkt. No. 9, Toth Aff. at Ex. 13. On June 25, 1997, the Local 120 executive board resolved "to leave the money that has accumulated in the Building Corporation in that account." *See* Dkt. No. 27, Statement of Material Facts at ¶ 25; Dkt. No. 9, Toth Aff. at Ex. 13.

In September 2000, Local 120's executive board proposed, *inter alia*: (1) that the Building

Corporation change its name to 325 Bleecker, Inc.; (2) that Local 120 and the Building Corporation enter into a long-term lease; and, (3) that Local 120 sell the furnishings and equipment in the in the union hall to the Building Corporation.  Dkt. No. 20, Order at 5.  The sole purpose of the recommendations was to "avoid having the Union Hall transferred by the UBC if there was a merger or dissolution of Local 120.  *See* Dkt. No. 17, Smith Reply Aff. at ¶ 7.  On September 13, 2000, Local 120's membership, which, as noted above, was synonymous with the Building Corporation's membership, approved its executive board's proposal.  *See* Dkt. No. 27, Statement of Material Facts at ¶ 23.  The Building Corporation's Certificate of Amendment was executed on September 15, 2000, and subsequently filed with the New York State Secretary of State on September 28, 2000.  *See* Dkt. No. 29, Statement of Material facts at ¶ 15.  Thus, the Building Corporation's Certificate of Incorporation was amended to change the name of the Building Corporation to 325 Bleecker, Inc. *See* Dkt. 27, Statement of Material Facts at ¶ 15; Dkt. No. 20, Order at 5.  Accordingly, by September 1, 2001, the time at which the UBC consolidated Local 120 into Local 747, the Building Corporation had already changed its name to 325 Bleecker, Inc.  *See* Dkt. No. 20, Order at 5.  By August 10, 2001, however, all parties knew of the pending UBC consolidation and merger directive.  A mere three days later, 325 Bleecker, Inc., or more specifically, 325 Bleecker, Inc.'s officers, the officers of the former Local 120, transferred 325 Bleecker, Inc.'s account balance in the HSBC Bank to the Bank of Utica and placed on deposit the balance in the form of a Certificate of Deposit in the name of 325 Bleecker, Inc.

In each of the fiscal years of Local 120, commencing with the fiscal year beginning July 1, 1994, up until the dissolution of Local 120 effective September 1, 2001, the Building Corporation filed form LM-2 report with the United States Department of Labor as a subsidiary organization of Local 120.  For each of the fiscal years of Local 120, commencing with fiscal year beginning July 1, 1994, up until its terminal report for the period ending August 31, 2001, Local 120 reported the

Building Corporation as a subsidiary organization on its LM-2 annual report filed with the Department of Labor.  For each of Local 120's fiscal years commencing with the fiscal year beginning July 1, 1994, through Local 120's fiscal year ending June 30, 2000, Local 120 reported on its form LM-2 annual report filed with the Department of Labor, under the category "other assets," a $116,000 advance to the Building Corporation.  Commencing with Local 120's fiscal year ending June 30, 2001, Local 120 ceased reporting on its form LM-2 annual report filed with the Department of Labor the $116,000 advance to the Building Corporation which had been reported in its prior years' LM-2 reports under the category "other assets."  Dkt. No. 27, Statement of Material Facts at ¶¶ 26-29.  In each of Local 120's fiscal years, commencing with Local 120's fiscal year beginning July 1, 1994, through Local 120's fiscal year ending June 30, 2000, the financial statements and supplemental schedules prepared for Local 120 by its certified public accounting firm, D'Arcangelo & Co., LLP, reported that Local 120 "has made advances to Carpenters Local 120 Building Corporation totaling $116,000 in connection with the corporation's purchase of an office building at 325 Bleecker Street, Utica, New York.  There was no written contract, mortgage, bond or note evidencing this indebtedness by the 'Real Estate Corporation.'  Future repayments on the advances will be made by the corporation as surplus becomes available."  *Id.* at ¶ 30.  In the fiscal year ending June 30, 2001, the financial statements and supplemental schedules of Local 120 prepared by Local 120's certified public accountants, D'Archangelo & Co., LLP, reported that "[e]ffective September 1, 2001, the . . . Local Union 120 will be dissolved and its jurisdiction and membership will be merged into . . . Local Union 747. All books, records, property, accounts and other assets of Local Union 120 will be transferred to Local Union 747."  *Id.* at 31.  In the fiscal year ending June 30, 2001, the financial statements and supplemental schedules of Local 120 prepared by Local 120's certified public accountants, D'Archangelo & Co., LLP, reported that

the former Carpenters Local 120 Benefit and Defense Fund made transfers to the

Carpenters Local 120 Building Corporation totaling $116,000 during 1994 through 1996 in connection with the Corporation's purchase of an office building at 325 Bleecker Street, Utica, New York. The transfers were previously reflected as a loan receivable on the Union's financial statements. However, since these transfers were made outright, and there is no written evidence that it was intended to constitute a loan or indebtedness of the 'Real Estate Corporation,' a prior-period adjustment has been made. The effect of the prior-period adjustment on the financial statements was a decrease to the assets and net assets of $116,000 as of an[d] for the year ended June 30, 2000.

Dkt. No. 27, Statement of Material Facts at ¶ 32.

As of June 13, 2002, days prior to the commencement of the eviction action by plaintiff, Local 747 President, Gary Toth, removed Local 120's former officers as officers of 325 Bleecker, Inc., and replaced them with Local 747 trustees.  Nevertheless, 325 Bleecker, Inc., refuses to recognize the UBC's authority to transfer the former Local 120's building corporation and its assets to Local 747, and the former officers of the former Local 120 continued to hold themselves out as authorized to act on behalf of 325 Bleecker, Inc.  *See* Dkt. No. 20, Order at 5-6.  On August 19, 2002, at a meeting where 325 Bleecker, Inc.'s Board of Directors invited "members of the property corporation," the Board of Directors claim to have amended the bylaws of the Building Corporation to include as members of the not-for-profit corporation (within the meaning of New York Not-For-Profit Corporation Law), union members of unions other than Local 747 or the former Local 120, if, under a collective bargaining agreement between such unions and employers, fringe benefit contributions are payable or permitted to be paid to the Carpenters Local No. 120 Health Care Fund, the Carpenters Local No. 120 Pension Fund and/or the Carpenters Local 120 Defined Contribution Fund, provided that such not-for-profit corporate member is a participant (or is eligible to participate) in any such funds, and any of such funds are, in fact, such individuals' "home fund" for benefit purposes.  *See* Dkt. No. 27, Statement of Material Facts at ¶ 33; Dkt. No. 9, Toth Aff. at ¶¶ 14-15, Ex. 8.  In other words, the amendment,  if put into effect, would dilute the ownership of 325 Bleecker, Inc. and its Real Property by including members from other unions, *i.e.*, unions other than Local 747 or the

former Local 120.  *See* Dkt. No. 30, Order at 6.  In September 2003, Edward Morgan, purportedly as President of the Building Corporation, issued a notice of meeting calling a meeting of the Building Corporation's members for September 30, 2003, to be held at Kitty's on the Canal, inUtica, New York.  Dkt. No. 27, Statement of Material Facts at ¶ 34.

On August 13, 2001, monies on deposit in the HSBC Bank in the sum of $42,501.43 were transferred to the Bank of Utica, and placed on deposit in the form of a certificate of deposit in the name of 325 Bleecker, Inc.  *See* Dkt. No. 9,  Toth Aff., Ex. 7.  On August 23, 2002, the amounts on deposit with the Bank of Utica, in the sum of $44,383, were withdrawn and deposited in a checking account via two certificates of deposit in the Adirondack Bank in the name "325 Bleecker, Inc." *Compare* Dkt. No. 27, Statement of Material Facts at ¶ 37 *with* Dkt. No. 29, Statement of Material facts at ¶ 37.  Representatives and claimed officers of the Building Corporation, including Edward Morgan, have transacted business from the Adirondack Bank, checking account number1400045355, since the inception of the account on August 23, 2002, up until at least the issuance of check 1059, paid from the account on October 3, 2003, in the sum of $2,400 payable to attorney Edward Crumb. *See* Dkt. No. 27, Statement of Material Facts at ¶ 38.  Check number 1046,  payable to attorney Edward Crumb in the sum of $3,800, was written on and paid from the Adirondack Bank checking account number 1400045355.  *See id.* at ¶ 39.  Check number 1050, payable to Edward Morgan in the sum of $99.48, was written and paid on Adirondack Bank checking account number 1400045355. Check number 1050 included reimbursement of expenses by the Building Corporation to Edward Morgan for his attendance at the preliminary injunction hearing.  *See id.* at ¶¶ 40-41.

## II.    DISCUSSION

### A.    *Summary Judgment Standard*

The standard for summary judgment is familiar and well-settled.  Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and

9

the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1991) (quoting FED. R. CIV. P. 1).  A court may grant a motion for summary judgment when the moving party carries its burden of showing that no triable issues of fact exist.  *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party.  *See id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).  If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e). The role of the court on a motion for summary judgment is not to try issues of fact but only to determine whether there are issues of fact to be tried. *See*, *e.g.*, *Anderson*, 477 U.S. at 255; *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1223-24 (2d Cir. 1994); *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987).  The drawing of inferences and the assessment of the credibility of the witnesses remain within the province of the finders of fact.  To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper.  *See Anderson*, 477 U.S. at 250-251.

## B.   Law of the Case Doctrine

In its moving papers, defendant has invoked the law of the case doctrine, *see* Dkt. No. 27, Mem. of law at 13-14, which posits that "when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7 (2d Cir. 1996) (citations and internal quotation marks omitted). "The doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Id.* (citation and internal quotation marks omitted). A district court may reconsider its own decision if the law has since changed, new evidence becomes available, to correct an error, or if a "manifest injustice would otherwise ensue." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 44 (2d Cir. 2005). After having reviewed the previous order and the case law upon which it is based, this Court finds that those rulings apply with equal force today.

      C.      *Subject Matter Jurisdiction*

Local 747 asserts a federal cause of action under, *inter alia*, 28 U.S.C. § 1331 and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. Section 1331 pertains to "arising under" jurisdiction and gives federal courts jurisdiction over "all civil actions arising under the Constitution, Laws, or treaties of the United States." 28 U.S.C. § 1331. This jurisdictional statute does not, in and of itself create a cause of action, but rather depends upon an action arising under a separate federal law before a district court's jurisdiction is proper.

Section 301(a) of the LMRA provides federal district courts with jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations." 29 U.S.C. § 185(a). The LMRA defines labor organization as: "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). In enacting Section 301, Congress was apparently concerned

11

that unions be made legally accountable for agreements into which they entered among themselves . . . Therefore, § 301(a) provided *federal* jurisdiction for enforcement of contracts made by labor organizations to counteract jurisdictional defects in many state courts that made it difficult or impossible to bring suits against labor organizations by reason of their status as unincorporated associations.

*United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. v. Local 334*, 452 U.S. 615, 624 (1981).  A union constitution can be a contract between labor organizations within the meaning of Section 301 and thus, a breach of a union constitution is cognizable under Section 301 of the LMRA.  *See id.*, 452 U.S. at 620-621.

Not all provisions of a union's constitution, however, may be enforced by suit under Section 301.  Jurisdiction under Section 301 to enforce a union contract does not extend to mere intra-union disputes; the dispute must relate to a collective bargaining agreement.  *See Brown v. American Arbitration Ass'n*, 717 F.Supp. 195, 198-99 (S.D.N.Y. 1989); *United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Albany*, 553 F.Supp. 55, 59 (N.D.N.Y. 1982) (explaining that the court has no power under either the LMRA or LMRDA to enforce the provisions of a union's constitution and by-laws, but can only intervene when they are applied in such a way as to deprive union members of rights guaranteed by those acts); *Sanceverino v. Union Local 445*, 510 F.Supp. 590, 592 (S.D.N.Y. 1981) ("[S]ection 301 jurisdiction does not extend to intra-union disputes simply because those disputes are governed by (and perhaps resolved under) the [international union's] constitution.").

Local 747 has alleged no employer-union relationship here; consequently, in order to assert a cause of action under Section 301, it must allege a violation of a contract between itself and another labor organization.  In its LM-2 reports[2] filed with the Department of Labor, Local 120 consistently classified the Building Corporation as its subsidiary organization.  The LMRA's definition of labor organization is instructive here for it includes, "any organization of any kind . . . which exists for the

---

[2]Pursuant to section 201(b) of the LMRDA, every labor organization must file an annual LM-2 Report with the Secretary of Labor. This Report must disclose the organization's financial condition and operations for the preceding year. *See* 29 U.S.C. § 431(b).

purpose, in whole *or in part*, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5) (emphasis added). Prior to the onset of this litigation, Local 120 had always treated the Building Corporation as a subsidiary organization as evidenced by the LM-2 reports Local 120 filed with the Department of Labor. Here, the LM-2 reports are relevant because they clarify whether the Building Corporation/325 Bleecker, Inc., was an asset of Local 120. The LM-2 report requires a labor organization to report any "subsidiary organizations" which the LM-2 defines as:

> any separate organization of which the ownership is wholly vested in the reporting labor organization or its officers or its membership, which is governed and controlled by the officers, employees, or members of the reporting labor organization, and which is wholly financed by the reporting labor organization. A subsidiary organization is considered to be wholly financed if the initial financing was provided by the reporting labor organization even if the subsidiary organization is currently wholly or partially self-sustaining. *An example of a subsidiary organization is a building corporation which holds title to a building; the labor organization owns the building corporation, selects the officers, and finances the operation of the building corporation.*

(emphasis added). Dkt. No. 8, Byington Decl., Ex. 6, Department of Labor Form LM-2 Instructions. In every single LM-2 annual report filed with the Department of Labor between 1994 and 2001, Local 120 reported the Building Corporation as a subsidiary organization. *See* Dkt. No. 8, Byington Decl. at Ex. 6; Dkt. No. 27, Statement of Material Facts at ¶¶ 26-29. Under the above definition, it is clear that the Building Corporation was an asset of Local 120.

Given that the Building Corporation is a subsidiary organization, which exists, at least in part to facilitate the union's ability to deal with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, the Building Corporation, broadly defined, could itself be classified as a labor organization. Even after the Building Corporation changed its name to 325 Bleecker, Inc., it still functioned as a subsidiary organization and asset of Local 120, for it remained Local 120's meeting hall and was used to conduct Local 120's affairs. 325 Bleecker, Inc.'s corporate title does not shield the fact that it functioned as the former Local 120's union hall.

Federal law provides that state law doctrines of corporate autonomy may be disregarded when the corporate form is used to defeat the ends of federal law: "[a]lthough a corporation and its shareholders are deemed separate entities for most purposes, the corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy . . . In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form." *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713 (1974) (citations omitted).

As described above, Section 301 confers jurisdiction in the federal courts for "[s]uits for violation of contracts between . . . labor organizations."  Suits based upon the terms of union constitutions fall within Section 301's ambit. *Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 101 (1991). "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.' " *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (quoting *Elec. Workers v. Hechler*, 481 U.S. 851, 859 n. 3 (1987)).  The UBC's Constitution is enforceable under federal labor laws.

Fundamentally, this case is before the Court as part of controversy between two labor organizations: (1) Local 747, which represents the UBC's interests, and (2) a subsidiary organization of the former Local 120, which, as a former UBC member organization, was a contractual party to the UBC's constitution.  *See Hanson v. Huston*, 841 F.2d 862 (8th Cir. 1988).[3]  Therefore, the Court

---

[3] In *Hanson*, an international parent union imposed a trusteeship pursuant to its constitution on a local union, and the local's executive board refused to recognize the trusteeship.  The trustee brought a motion for a preliminary injunction against the executive board members to enforce the trusteeship and to order them to recognize the trustee's appointees as directors of a non-profit building corporation and to deliver to the trustee custody and control of the building corporation's books, records and assets.  The local had created the building corporation to hold title to its union hall.  The district court granted the trustee's motion for a preliminary injunction and denied the building corporation's motion to intervene.  On appeal, the Eighth Circuit affirmed the district court's ruling upholding the district court's finding  that the building corporation did not function separately from the local and that the building corporation's corporate form could not be used to frustrate enforcement of the international parent union's constitutional directive.

finds that 29 U.S.C. § 185 supports a cause of action for Local 747 against 325 Bleecker, Inc.

> D. *Application of the UBC's Constitution*

The UBC's Constitution grants to the General President broad powers to exercise authority over subordinate bodies, including the dissolution and merger of local unions as occurred here. *See* Dkt. No. 9, Toth Aff., Ex. 1, UBC Constitution § 6A. Various federal circuit courts of appeal have upheld the General President's authority to consolidate, merge and dissolve local unions under the UBC Constitution. *See, e.g.*, *Lathers Local 42-L v. United Brotherhood of Carpenters*, 73 F.3d 958, 963 (9th Cir. 1996); *Dresden Local No. 267 v. United Brotherhood of Carpenters*, 992 F.2d 1418 (6th Cir. 1993); *Local 1052 v. Los Angeles County District Council of Carpenters*, 944 F.2d 610, 613-14 (9th Cir. 1991); *Local No. 48 v. United Brotherhood of Carpenters*, 920 F.2d 1047 (1st Cir. 1990); *Millwright Local No. 1079 v. United Brotherhood of Carpenters*, 878 F.2d 960 (6th Cir. 1989), *cert. denied*, 493 U.S. 965 (1990). Under Section 6A of the UBC Constitution, General President McCarron's order dissolving Local 120 and merging it into Local 747 was a valid exercise of authority under the UBC Constitution, and enforceable under federal labor law.

Upon dissolution of a local union, "all Property, Books, Charter and Funds held by, or in the name of, or on behalf of said Local Union, or other subordinate body must be forwarded immediately to the General Secretary-Treasurer for such use or disposition in the interests of the membership of the United Brotherhood as the General President in the exercise of his or her discretion may direct." Dkt. No. 9, Toth Aff., Ex. 1, UBC Constitution, Section 30A. In accordance with this provision of the UBC Constitution, General President McCarron's directive that all of the assets of the dissolved Local 120 be transferred to Local 747, including the Building Corporation and the property and assets in its possession or control, including the Real Property, was a valid exercise of authority by the General President and is enforceable under federal labor law.

The UBC Constitution and federal labor law dictate that the Building Corporation and all of

15

its property and assets were assets of the dissolved Local 120 and are now assets of Local 747 to be held in accordance with the UBC Constitution.  Section 54 of the UBC Constitution sets forth various rules regarding local union funds and properties, including the following:

> The General Funds or property of a Local Union or Council shall be used only for such purposes as are specified in the Constitution and Laws of the United Brotherhood and as may be required to transact and properly conduct its business, viz.: Payment of salaries and donations to sick members; purchasing stationery, books, cards, printing, payment of rent, or any legally authorized bill against the Local Union or Council. . . Violation of this section subjects the offending Local Union or Council to the penalty of suspension. Funds to be used for any other purpose must be handled through a Contingency Fund . . . The funds or property of a Local Union cannot be divided in any manner among the members individually, but shall remain the property of the Local Union for its legitimate purpose. Any Local Union charging more than the minimum dues as prescribed in Section 45A or any Council may create a Special Relief and Contingent Fund for use aside from the General Fund . . . This Fund may be used for the relief of aged members, organizations, or for any other purpose the Local Union may decide, except to support dual organization, for partisan politics, religious purposes, or investments in a credit union sponsored by the Local Union, or for any purpose that may be inimical to the interests of the United Brotherhood; *provided, however, if property is purchased with said fund the property shall be held in the name of the Local Union or Council of the United Brotherhood of Carpenters and Joiners of America, as specified in the Constitution of the United Brotherhood*.

Dkt. No. 9, Toth Aff., Ex. 1, UBC Constitution, Section 54A,C and E (emphasis added).  Here, Local 120's funds purchased, renovated, maintained and operated the Real Property.  The requirement that the Real Property be held in the name of Local 120 is an obligation under Section 54 of the UBC Constitution and is enforceable under federal labor law.

Section 40A of the UBC Constitution mandates that local unions maintain control of local union properties by requiring that ownership and control of such property be through the local union Trustees: "The Trustees shall have the supervision of all funds and properties of the Local Union, subject to such instructions as they may receive from time to time from the Local Union.  The title to all property to the Local Union shall be held in the name of the Trustees of the Local Union and/or their successors in office."  Dkt. No. 9, Toth Aff., Ex. 1, UBC Constitution, Section 40A.  For

16

decades, UBC locals have applied Section 40A of the UBC's Constitution to building corporations of local unions, such as the Building Corporation in this case. *See id.*, Toth Aff. at ¶ 9; Ex. 3.

As President of Local 747, Toth's removal of the officers of the Building Corporation and his replacement of those officers with Local 747's Trustees was a valid exercise of authority consistent with longstanding interpretations of Sections 54 and 40A of the UBC's Constitution. "[A] union's interpretation of its own constitution is entitled to 'great deference' and will be upheld unless 'patently unreasonable.' " *Mason Tenders Local 59 v. Laborers International Union*, 924 F. Supp. 528, 543 (S.D.N.Y. 1996) (collecting cases); *aff'd* 101 F.3d 686 (2d Cir. 1996); *Local No. 48, United Brotherhood of Carpenters v. United Brotherhood of Carpenters*, 920 F.2d at 1051 ("There is a well-established, soundly based policy of avoiding unnecessary judicial intrusion into the affairs of labor unions.").

The Court finds that the Building Corporation has at all times been a "subsidiary organization" of the former Local 120 under federal labor law, and that the Building Corporation and Real Property are assets of the former Local 120, which have been transferred to Local 747 by UBC General President McCarron in accordance with the UBC Constitution.

### E.   The Standards for a Permanent Injunction and Declaratory Relief

"Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989). In addition, the movant must demonstrate actual success on the merits rather than a likelihood of success, as is required when a preliminary injunction is requested. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). Local 747 also seeks declaratory relief pursuant to 28 U.S.C. § 2201, which provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be

sought." 28 U.S.C. § 2201. "[A] court must entertain a declaratory judgment action: (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734 (2d Cir. 1992) (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)). The Declaratory Judgement Act "does not by itself confer subject matter jurisdiction on the federal courts . . . [r]ather, there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." *Correspondent Servs. Corp. v. First Equities Corp. of Florida*, 442 F.3d 767, 769 (2d Cir. 2006). In this case there is an independent basis for jurisdiction, namely 28 U.S.C. § 1331 federal question jurisdiction in conjunction with the LMRA.

Local 747 asserts that there has been no change in plaintiff's activities since the preliminary injunction was granted.

1.    Irreparable Harm

Irreparable harm is that injury which is so serious that a monetary award cannot adequately compensate the injured party. *See Citibank N.A. v. Citytrust*, 756 F.2d 372, 275 (2d Cir. 1985). The mere possibility of harm is not sufficient as the harm must be imminent and the movant must show that he is likely to suffer irreparable harm if equitable relief is denied. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 817 F.2d 75, 79 (2d Cir. 1990).

Here, Local 747 is threatened with substantial and irreparable harm. The failure of 325 Bleecker, Inc. to recognize the UBC's directives causes a substantial hardship to the UBC because it deprives it of its right to self-governance in enforcing its constitution. *See Mason Tenders Local 59 v. Laborers Int'l Union*, 924 F.Supp. 528, 543 (S.D.N.Y. 1996). Local 747 also faces irreparable harm because if 325 Bleecker, Inc.'s bylaw amendment were to be given effect in the absence of a permanent injunction, the individuals who would gain an interest in 325 Bleecker, Inc. would not be

subject to the UBC Constitution, and Local 747 would be unable to regain its rightful full title, use and possession through enforcement of the UBC Constitution.

325 Bleecker, Inc.'s transferred account balance also presents an irreparable harm, for if 325 Bleecker, Inc. were to dissipate the account balance, any recovery in favor of Local 747 would be illusory.  325 Bleecker, Inc., including the Real Property and assets, is an asset of Local 747. Therefore, any damages Local 747 might recover against 325 Bleecker, Inc. would be an award payable out of its own assets.

2.       Actual Success on the Merits

Local 747 has demonstrated actual success on the merits.  Local 747 has demonstrated that the former Local 120 was a member organization of the UBC.  Local 747 has also demonstrated that as a member organization, the former Local 120 was subject to the UBC's Constitution.  Furthermore, Local 747 has demonstrated that a union's constitution is a contract between labor organizations as defined by the LMRA and is enforceable under 29 U.S.C. § 185(a).  Section 6A of the UBC Constitution provides in pertinent part:

> The [UBC] is empowered . . . where the General President finds that it is in the best interests of the [UBC] and its members locally or at large, to establish or dissolve any Local Union or Council, to merge or consolidate Local Unions or Councils, to establish or alter the trade or geographical jurisdiction of any Local Union or Council, to form Councils and to permit, prohibit or require the affiliation with or disaffiliation from any Council by any Local Union, including the right to establish statewide, province wide and regional Local Unions or Councils having jurisdiction over specified branches or subdivisions of the trade.

Local 747 has shown that the UBC General President issued a restructuring order on August 10, 2001, which dissolved Local 120, merged Local 120's membership into Local 747, and transferred all of Local 120's assets, including the Real Property located at 325 Bleecker Street, Utica, New York and its books, records, property, accounts to Local 747.  Local 747 has demonstrated that 325 Bleecker, Inc. was an asset of the former Local 120.  In short, Local 747 has presented evidence which demonstrates actual success on the merits.

## III.     CONCLUSION

WHEREFORE, after careful consideration of the parties' submissions and the applicable law, the Court hereby

ORDERS that: (1) 325 Bleecker, Inc., formerly known as Carpenters Local No. 120 Building Corporation and all of its assets, including the property and premises located at 325 Bleecker Street, Utica, New York (the "Real Property"), have at all relevant times been assets of the former Carpenters Local Union No. 120 ("Local 120"), and subject to and governed by the Constitution and Laws of the United Brotherhood of Carpenters and Joiners of America (the "UBC" and "UBC Constitution"), including as of the date of the dissolution and transfer of assets of Local 120 by UBC General President Douglas J. McCarron, effective September 1, 2001; (2) that all of the assets and property of the dissolved Local 120, including the Building Corporation and the Real Property, are, as of September 1, 2001, the property and assets of Local Union No. 747, United Brotherhood of Carpenters and Joiners of America ("Local 747"), pursuant to the August 10, 2001, order and direction of dissolution and transfer of assets by UBC General President Douglas J. McCarron; (3) that Local 747 be awarded possession, use and enjoyment of the Real Property; and (4) that the June 13, 2002, removal and interim appointment of officers of the Building Corporation by Local 747's President pursuant to the UBC Constitution was valid and of full force and effect; the Court further

PERMANENTLY ENJOINS and RESTRAINS the former officers of the Building Corporation., including Edward Morgan, William Gibson, Patricia LaBella and Mike Juliano, their attorneys, representatives, agents and employees, from: (1) refusing to turn over any and all property, books, records, funds and assets of the Building Corporation, and that they do immediately turn over all such things; (2) holding themselves out to others as officers or representatives of the Building Corporation; (3) acting on behalf of the Building Corporation; (4) interfering with or attempting to interfere with Local 747's rights under the UBC Constitution with respect to the possession and control of the Building Corporation and its assets and the Real Property; (5) asserting possession or

control over the property and assets of the Building Corporation, including the Real Property and any funds on deposit with any bank in the name of the Building Corporation; (6) dissipating, transferring, encumbering or expending any type of assets of the Building Corporation, including the Real Property and any funds on deposit with any bank in the name of the Building Corporation; the Court further awards judgment in favor of defendant and against the plaintiff, and dismisses the petition herein in its entirety.  In sum, defendant's motion is GRANTED in full.

IT IS SO ORDERED.

Dated: March 31, 2007
      Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge